UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

VARSITY GOLD, INC.,

    Plaintiff,

v.

ELITE FUNDRAISING LLC,

    Defendant.

No. C05-1048P

ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

This matter comes before the Court on plaintiff Varsity Gold, Inc.'s motion for a preliminary injunction. (Dkt. No. 8). Having reviewed the papers and pleadings submitted by the parties and having heard oral argument on this matter, the Court hereby GRANTS IN PART and DENIES IN PART Plaintiff's motion. Although the Court finds that a preliminary injunction is warranted to enjoin Defendant from engaging in certain types of conduct, the injunctive relief ordered by the Court is more narrow than the relief requested by Plaintiff.

Pursuant to Fed. R. Civ. P. 52(a), the Court's findings of fact and conclusions of law are set forth below.

## FINDINGS OF FACT

Plaintiff Varsity Gold, Inc. ("Varsity Gold") and defendant Elite Fundraising LLC ("Elite") produce fundraising products for schools, school athletic teams, and other community organizations. The companies' products include fundraising discount cards. To provide these products, the companies contract with local merchants, who agree to offer discounts to purchasers of the

ORDER - 1

1  fundraising cards.  Members of the school, team, or organization then sell the fundraising cards to the

2  public.  A percentage of the money raised by selling the cards is paid to the companies; the remaining

3  money goes to the school, team, or community organization.  Varsity Gold is located in Arizona and

4  works with approximately 7,000 schools and organizations throughout the United States, including

5  schools in Washington state.   Elite is based in Vancouver, Washington.

6  　　　Varsity Gold and Elite both frequently contact merchants to ask them to participate in

7  fundraising card programs that will benefit local high schools and community organizations.  By

8  participating in these fundraising card programs, merchants may benefit from increased business.

9  Varsity Gold asks merchants who participate in fundraising card programs to sign written contracts,

10  also known as "merchant agreements."  Varsity Gold's merchant agreements provide that the

11  merchant will not establish or maintain any discount programs with schools or organizations other than

12  those established by and through Varsity Gold "for the duration of the Agreement and for one year

13  following the expiration of this Agreement."  (Dkt. No. 13, Ex. B).  By contrast, Elite acknowledged

14  at oral argument that it does not execute written contracts with participating merchants.  Instead, it

15  appears that Elite contacts merchants by telephone through a centralized call center and informs the

16  merchants that their agreements over the phone will serve as authorization for Elite to include them on

17  a fundraising card.

18  　　　Varsity Gold and Elite also execute contracts with schools and other community organizations

19  in which the companies agree to produce fundraising products for the schools or organizations.  A

20  school contract, or "fundraiser agreement," produced by Varsity Gold provides that the

21  school/organization "agrees that, for a period of two (2) years following the expiration of the

22  fundraiser agreement, it will not sell, produce, or have produced a similar fundraising product, by itself

23  or with any other Company, and it will not use the same merchants provided by Varsity Gold, Inc. in

24  the fulfillment of its obligations."  (Dkt. 13, Ex. A).  The Varsity Gold contract provides that it shall

25  be interpreted under Arizona law.  Id.

ORDER - 2

Varsity Gold has produced several declarations regarding telephone calls that representatives from Elite recently made to merchants who had previously entered into fundraising agreements with Varsity Gold. This evidence includes a declaration from Ray Shine, a sales manager for Athletic Supply Company in Redmond, Washington. (Dkt. No. 10). Mr. Shine states that his company has participated in fundraising programs for Varsity Gold and various high schools for several years. Mr. Shine states that on June 3, 2005, he received the following voice message:

> Hi Ray, this is Whitney. I'm calling on behalf of the Eastlake High School. You actually helped us out with a fundraiser card last year doing a 10% off. And we were just really hoping that you guys could participate again. If you could give me a call back today at toll free 866.543.5483 that would be wonderful. Thank you so much. Bye.

(Dkt. No. 10, at 2). This message was left by Whitney Cobb of Elite. (Dkt. No. 21). Mr. Shine states that the only discount card on which his business had participated during the last several years, and the only discount card for Eastlake High School last year, was produced by Varsity Gold. (Dkt. No. 10, at 2).

Varsity Gold has also produced declarations from Clare Aguirre and Greg Maples of High Tech Burrito in the San Francisco Bay Area. (Dkt. Nos. 11-12). Ms. Aguirre and Mr. Maples state that High Tech Burrito participated in a Varsity Gold fundraising card last year for various high schools. Ms. Aguirre states that on May 24, 2005, she received a phone call from a woman who said that High Tech Burrito had participated with them last year on a fundraising card for Bay Area schools, and asked if High Tech Burrito wanted to "renew" with the fundraiser card and offer the same discount this year. Ms. Aguirre states that she "assumed that [the caller] was calling from the existing vendor we did business with to renew the discount card we participated on last year," which was Varsity Gold. (Dkt. No. 11, at 2). Ms. Aguirre and Mr. Maples subsequently confirmed that the caller had not been from Varsity Gold, but from Elite. Id..; see also Dkt. 12, at 2. Ms. Aguirre states that the caller from Elite had "led me to believe that I was talking to our existing fundraising card vendor that we had done the fundraiser cards with last year." (Dkt. No. 11, at 2).

ORDER - 3

1    Varsity Gold has also offered a declaration from Matthew Patterson, the owner of a Blimpie
2  Subs and Salads shop in Redmond, Washington. (Dkt. 9). Mr. Patterson states that his business has
3  participated in a "Gold Card" fundraising program with Varsity Gold for several years to benefit
4  Redmond High School.   Mr. Patterson states that in June 2005, he received a phone call "from a
5  woman who said that she was calling from Eastlake High School about the 'Gold Card.'" Id. at 2.
6  Mr. Patterson indicates that the caller "noted that we had been on the card last year and asked if we
7  wanted to 'renew' and offer the same discount on a card for Eastlake High School." Id.  Mr.
8  Patterson agreed because he believed that this was the same Gold Card offered from Varsity Gold that
9  he had been doing for Redmond High School.  Mr. Patterson states that the called told her that their
10 phone call was being recorded and that would serve as their agreement.  Mr. Patterson later confirmed
11 that the caller was from Elite, rather than Varsity Gold.  He states that he was confused and upset and
12 felt that he had been "tricked into agreeing to participate" on the Elite card. Id.
13    More generally, Varsity Gold has produced a declaration dated July 13, 2005 from Steve
14 Grant, a Varsity Gold independent agent in the Bay Area. (Dkt. No. 13). Mr. Grant states:

15> Over the last several weeks . . . I have been making my rounds to visit merchants in order to renew their participation on the [Varsity] Gold Card.  In several instances I was met with surprise by the merchants with whom I have dealt for one or more years on the Varsity Gold program.  The merchants were surprised that I was asking about being on the Gold Card because they had received calls that same day or within the last week about renewing their participating on the discount card.  When I explained to them that Varsity Gold had not called them they were confused.
>
> In each case, the merchant was contacted by a caller stating that the merchant had been on last year's discount card and that the caller wanted them to renew participation on the card with the same offer from the previous year.  In each case, the merchant agreed, believing that the caller was from Varsity Gold, as that had been the program from the prior year.  In each case, the caller stated that the phone call was being recorded and that would serve as the agreement.

Id., at 2-3.

   Varsity Gold also has produced a declaration from Doug McGill, a football coach at Eastmont
High School in East Wenatchee, Washington. (Dkt. No. 15). Mr. McGill states that he signed an

ORDER - 4

agreement with Varsity Gold in August 2004 for the 2005 fundraising season.  Mr. McGill indicates that he was contacted by an Elite representative in November 2004 about working with the company on a different fundraising card.  Mr. McGill maintains that when he told Elite that he was under contract to work with Varsity Gold, "Elite told me that the Varsity Gold contract was not enforceable because it required more than a one year commitment and that I did not have to honor it."  (Dkt. 15, at 2).  Mr. McGill states that based on what Elite told him, he agreed to sign on with Elite for 2005.  However, after discussing this matter with a Varsity Gold representative, Mr. McGill subsequently decided to honor the Varsity Gold contract.

In response, Elite has produced a declaration from Dave Delestatious, an Elite representative who had contact with Mr. McGill in early 2005.  (Dkt. No. 22).  Mr. Delestatious claims that he did not tell Mr. McGill that the Varsity Gold contract was not enforceable and that he told Mr. McGill that he did not know what the legal options were.  Id.

Varsity Gold also maintains that it entered into a fundraising agreement with White River High School in August 2004 which required the school to work exclusively with Varsity Gold on fundraising cards for the football team for a period of two years.  (Dkt. 14, at 6).  Steve Holden of Varsity Gold states that in March 2005, he was contacted by the White River football coach.  According to Mr. Holden, the coach indicated that he had been offered a deal by Elite that was too good to pass up, and would not be working with Varsity Gold in 2005.  Mr. Holden states that Varsity Gold has not revived its relationship with White River.  Id.

Elite has moved to strike certain evidence submitted by Varsity Gold as inadmissible.  However, as Varsity Gold correctly notes, district courts have discretion to give otherwise inadmissible evidence some weight in ruling on an application for a preliminary injunction.  Flynt Distrib. Co. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984).

ORDER - 5

CONCLUSIONS OF LAW

Varsity Gold alleges violations of the Lanham Act for false designation of origin and false advertising, as well as common law claims for tortious interference with Varsity Gold's contracts and business expectancies and claims under the Washington Consumer Protection Act. In its proposed order, Varsity Gold requests a preliminary injunction that would enjoin Elite from:

(a) Representing or committing any act that is calculated to or is likely to cause third parties to believe that Elite's products are sponsored by, affiliated with or have the endorsement or approval of Varsity Gold.

(b) Making any statement that in any way confuses consumers concerning the source, nature, or characteristics of Varsity Gold's or Elite's fundraising cards.

(c) Interfering with any existing contractual relationship between Varsity Gold and third parties, including but not limited to the following acts:

* Soliciting any third party to participate on a fundraising card where Elite knows or should know that the party has a contractual relationship with Varsity Gold;

* Making any statement that may lead third parties to believe that they have previously done business with Elite when they have not;

* Making any statement that third party contracts with Varsity Gold are unenforceable or should be ignored.

(d) Distributing any fundraising cards for any school athletic program or organization or including any merchant that is under contract with Varsity Gold.

(Dkt. 8). Varsity Gold also seeks to enjoin Elite from distributing all fundraising cards, pending an opportunity for Varsity Gold to obtain expedited discovery regarding the schools and merchants for which Elite intends to distribute fundraising cards. Id. Varsity Gold asks the Court to enter an order requiring Elite to produce to Varsity Gold a copy of each fundraising card it intends to distribute along with the identity of the related school and merchants. Id.

I. Preliminary Injunction Standard

In general, issuance of preliminary injunctive relief is appropriate where the court determines: (1) the moving party will suffer irreparable injury if relief is denied; (2) the moving party will likely prevail on the merits at trial; (3) the balance of potential harm favors the moving party; and (4) in

ORDER - 6

certain cases, the public interest favors granting injunctive relief. Textile Unlimited, Inc. v. A..BMH Co., Inc., 240 F.3d 781, 786 (9th Cir. 2001). In requesting a preliminary injunction, a plaintiff meets its burden by demonstrating either: (1) a combination of probable success on the merits and the possibility of irreparable injury; or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. Id. These two formulations are not separate tests but represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. United States v. Odessa Union Warehouse Co-op, 833 F.2d 172, 174 (9th Cir. 1987).

II. Lanham Act Claims

Varsity Gold alleges two types of Lanham Act violations: (1) false designation of origin; and (2) false advertising. These claims arise under section 43(a) of the Lanham Act, which prohibits the commercial use of any false designation of origin or false or misleading description or representation of fact that would cause confusion, mistake, or deception as to the origin, affiliation, connection, association, or sponsorship of a service or product, or would misrepresent the nature, characteristics, or qualities of the service or product. 15 U.S.C. § 1125(a)(1).

To support its Lanham Act claims, Varsity Gold has submitted evidence regarding situations where Elite representatives contact a merchant who had previously participated in a Varsity Gold fundraising card and ask the merchant to "renew" or "participate again" in a fundraising card. Varsity Gold argues that such telephone calls lead merchants to believe that they are being asked to renew their participation in a Varsity Gold fundraising card, rather than entering into a new agreement with Elite.

A. Likelihood of Success on False Designation of Origin Claims

To prevail on a false designation of origin claim, a plaintiff must establish that the defendant's conduct is likely to cause confusion as to the origin or source of the service or good. GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1205 (9th Cir. 2000); Dreamwerks Prod. Group, Inc. v. SKG Studio, 142 F.3d 1127, 1129 (9th Cir. 1998). To assess the likelihood of confusion, the court

ORDER - 7

considers a non-exclusive set of factors: (1) the strength of the senior mark; (2) similarity of the marks; (3) proximity of the services provided by the parties under their respective marks; (4) marketing channels used; (5) evidence of actual confusion; (6) the type of services and the degree of care likely to be exercised by purchasers; (7) the likelihood of expansion of the services, and (8) defendant's intent in selecting the mark. AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979). No single factor is determinative, and the court need not rigidly apply equal weight to each. Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1391 (9th Cir. 1993). The first and second factors are not applicable here because Varsity Gold does not argue that parties' marks are similar.[1] In addition, neither party has produced evidence regarding the likelihood of expansion of the services or goods.

i.  Proximity of Services or Products

There is no serious dispute that Varsity Gold and Elite offer similar products; the companies are direct competitors in the fundraising card business. This factor favors Varsity Gold.

ii.  Marketing Channels

Varsity Gold uses in-person direct sales methods, while Elite uses telephone and fax direct sales methods. Although Elite argues that these are different marketing channels, it is undisputed that each company markets its services by directly contacting the merchants and the school or team representative. "Convergent marketing channels increase the likelihood of confusion." Nutri/System, Inc. v. Con-Stan Indus., Inc., 809 F.2d 601, 606 (9th Cir. 1987). Again, this factor favors Varsity Gold.

---

[1] As the first two factors suggest, the Sleekcraft factors are more typically applied in cases alleging the use of a confusingly similar trade or service mark. However, Varsity Gold notes that courts have also engaged in Sleekcraft-type analysis in cases where the false designation is "allegedly accomplished largely through clever use and manipulation of subtle language, context, innuendo, and false descriptions, rather than a confusingly similar trade or service mark." Register.com v. Domain Registry of America, Inc., 2002 WL 31894625, at *9 (S.D.N.Y. Dec. 27, 2002).

ORDER - 8

iii. Evidence of Actual Confusion

Evidence of actual confusion is generally the best evidence that future confusion is likely. Id. Varsity Gold maintains that merchants are likely to be confused when Elite representatives contact merchants by phone, indicate that the call is on behalf of a particular school, refer to the merchant's participation the previous year (which was done through Varsity Gold), and ask if the merchant would like to renew or participate again. Varsity Gold has submitted declarations from merchants with personal knowledge of Elite's representations over the phone, as well as declarations by Varsity Gold employees stating what other merchants have told them. These declarations provide evidence of actual confusion by merchants as a result of the "renewal" phone calls by Elite representatives. This factor favors Varsity Gold.

iv. Degree of Care Exercised by Purchaser

Elite argues that merchants are sophisticated and are not likely to be confused when dealing with aspects involving the marketing and advertising of their businesses. However, Varsity Gold maintains that merchants are not likely to exercise a high degree of care when Elite calls a merchant who had previously participated in a fundraising card with Varsity Gold for a local school, references the merchant's previous participation in such a card, and asks the merchant to renew or participate again in a card. It also appears that Elite informs the merchant that the phone conversation is sufficient to create an agreement. In such a situation, a merchant exercising ordinary care could reasonably believe that it was simply making a routine renewal of an agreement with its previous fundraising card vendor, rather than executing an agreement with a new vendor. A merchant who is not asked for a payment to participate is also not as likely to give the same care or attention as one who is selecting an item to purchase. Elite counters that merchants should not be confused because Elite's written communications and its cards display its logo and phone number. However, by the time the merchants see these cards, they may have already committed to working with Elite. Thus, the

initial confusion funnels merchants to Elite, even if the merchants later learn the true identity of the company.

### v. Intent to Confuse

Intent to confuse is not a necessary factor in succeeding on a false designation of origin claim, but if proven, it can create a presumption that the defendant succeeded in confusing the public. E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1293 (9th Cir. 1992). Varsity Gold argues that Elite's conduct shows an intent to cause confusion: contacting the same merchants that Varsity Gold worked with the previous year, failing to identify itself (at least initially) as a distinct company from Varsity Gold, referring to the merchant's previous participation and requesting renewal, and avoiding having to send written material by telling the merchant that the telephone conversation is sufficient to create an agreement. Taken as a whole, such conduct suggests an intent to confuse.

### vi. Summary

In light of the factors discussed above, the Court finds that Varsity Gold has shown a likelihood of success on its false designation of origin claims under the Lanham Act.

### B. Likelihood of Success on False Advertising Claims

To succeed on a false advertising claim under the Lanham Act, the plaintiff must show: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products. Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997). The false statement of fact may be either literally false or literally true but likely to mislead or confuse consumers. Id. The court must consider the allegedly false or misleading statement in its full context. Id.

ORDER - 10

For reasons similar to those discussed in Section II.A above, the Court finds that Varsity Gold has demonstrated a likelihood of success on the merits of its false advertising claims under the Lanham Act. The "renewal" solicitations by Elite representatives discussed earlier may not be literally false. However, they are misleading and are likely to confuse merchants who believe that they are renewing their participation in a fundraising card produced by Varsity Gold, rather than entering into a new agreement with Elite.

C. Irreparable Harm

Varsity Gold maintains that once the plaintiff in a Lanham Act action has established a likelihood of confusion, irreparable injury is presumed. Dkt. 8, at 20; see also Register.com v. Domain Registry of America, Inc., 2002 WL 31894625, at *16 (S.D.N.Y. Dec. 27, 2002) ("When a plaintiff establishes a likelihood of confusion under Section 43(a) of the Lanham Act, irreparable harm is presumed."). Elite does not dispute this assertion.

D. Balance of Hardships

If a preliminary injunction does not issue, Elite may continue to make telephone solicitations that lead merchants to believe that they are renewing their participation in Varsity Gold fundraising cards. By contrast, an injunction that requires Elite to refrain from certain misleading or confusing conduct when it solicits merchants should impose minimal hardships on Elite. Therefore, the Court finds that the balance of hardships tips sharply in Varsity Gold's favor.

E. Public Interest

In examining whether the public interest would be served by issuing a preliminary injunction, the Court primarily considers the impact on non-parties rather than parties. Sammartano v. First Judicial Dist. Court, 303 F.3d 959, 974 (9th Cir. 2002). Here, there is evidence that non-party merchants may be misled or confused by the type of "renewal" solicitations discussed above, as well as the failure to identify the company and relying only on the link to prior support for the school.

ORDER - 11

1 Therefore, the public interest would be served by granting an injunction to restrain Elite from engaging

2 in such misleading or confusing practices.

3     F.    <u>Conclusion</u>

4 In light of the factors discussed above, the Court finds that Varsity Gold has made a sufficient

5 showing that it is entitled to a preliminary injunction with respect to its Lanham Act claims.

6 III.    <u>Tortious Interference Claim</u>

7 Varsity Gold also alleges that Elite has tortiously interfered with Varsity Gold's contracts or

8 business expectancies with schools and merchants. This claim appears to be based on allegations that

9 Elite's solicitation efforts to schools and merchants have disrupted Varsity Gold's established or

10 expected business relationships. <u>See</u> Dkt. 8, at 16. Varsity Gold maintains that Elite has attempted to:

11 (1) confuse or mislead merchants into participation on Elite's fundraising cards; and (2) to induce

12 school organizations to breach their contacts with Varsity Gold. <u>Id.</u> With respect to the first issue,

13 the Court has already concluded that injunctive relief is warranted to address certain conduct that may

14 confuse or mislead merchants into participating on Elite's fundraising cards.

15 With respect to the second issue, Varsity Gold argues that Elite has tortiously interfered with

16 Varsity Gold's contractual relationships with two high schools (Eastmont and White River). Under

17 Washington law, a claim for tortious interference with a contract or business expectancy requires five

18 elements: (1) the existence of a valid contractual relationship or business expectancy; (2) that

19 defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a

20 breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper

21 purpose or used improper means; and (5) resultant damage. <u>Leingang v. Pierce County Med. Bureau,</u>

22 <u>Inc.</u>, 131 Wn.2d 133, 157, 930 P.2d 288 (1997).

ORDER - 12

Elite maintains that Varsity Gold cannot satisfy the first element, arguing that Varsity Gold's contracts with schools are invalid because they constitute a restraint on trade.[2] Varsity Gold's contracts with the school or organization include a clause requiring the school or organization to refrain from selling, producing, or having produced a similar fundraising product with any company other than Varsity Gold for two years after the expiration of the fundraising program. (Dkt. 13, Ex. A). Elite maintains that these restrictions are unlawful under Arizona law, which governs these contracts. Varsity Gold claims that such restrictive clauses are standard for companies performing services or providing products for schools and have been upheld in other states. Neither party points to Arizona case law that is directly on point.

As such, evaluating Varsity Gold's likelihood of success on its tortious interference claim would require the Court as a threshold matter to determine the validity of Varsity Gold's contracts with schools under Arizona law. The Court declines to engage in such analysis at this point in the proceeding, where the record is extremely limited and there is a lack of case law on point. See Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson, 799 F.2d 547, 551 (9th Cir. 1986) ("In deciding a motion for a preliminary injunction, the district court 'is not bound to decide doubtful and difficult questions of law or disputed questions of fact.'"). In any case, even if the Court were to ultimately conclude that Varsity Gold is likely to succeed on its tortious interference claim, Varsity Gold has not offered persuasive arguments that it faces a risk of irreparable harm as a result of Elite's alleged efforts to induce schools to break their contracts with Elite. In particular, Varsity Gold has not shown why monetary damages could not compensate Varsity Gold if Elite tortiously induces high schools to breach their contracts with Varsity Gold during the pendency of this action. See American

---

[2] Though not raised by the parties, the Court notes that Elite's own practice of executing oral contract with merchants may also raise concerns under Washington's statute of frauds (RCW 19.86.010).

ORDER - 13

Passage Media Corp. v. Cass Comms., 750 F.2d 1470, 1473-74 (9th Cir. 1985) ("Monetary damages are usually not sufficient to establish irreparable harm.").

In addition, a preliminary injunction regarding Elite's solicitation of schools would not be warranted because the balance of hardships does not sharply tip in Varsity Gold's favor. Varsity Gold may experience hardship if a school decides to breach its contract with the company in order to execute an agreement with Elite. However, restraining Elite from soliciting business from schools that have executed contracts with Varsity Gold would also work a significant hardship on Elite's ability to compete in the high school fundraising card business, given Varsity Gold's representation that it works with approximately 7,000 schools and organizations throughout the country. In addition, Varsity Gold has not offered persuasive evidence that a preliminary injunction restraining Elite's dealings with high schools under contract with Varsity Gold would serve the public interest.

## IV. Consumer Protection Act Claim

Finally, Varsity Gold raises claims under the Washington Consumer Protection Act (CPA). To prevail on a CPA claim, the plaintiff must show: (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) with a public interest impact; (4) injury; and (5) causation. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 780, 719 P.2d 531 (1986). The Court does not find it necessary to reach Plaintiff's CPA claims. Even if the Court were to conclude that plaintiff has shown that a preliminary injunction is warranted with respect to the CPA claims, the injunctive relief ordered by the Court below would not be materially different.

## INJUNCTIVE ORDER

"A preliminary injunction should be narrowly tailored to remedy the specific harm alleged." United States v. BNS, 858 F.2d 456, 464 (9th Cir. 1988). In addition, an order granting an injunction must be specific in terms and describe in reasonable detail the act or acts to be restrained. Fed. R. Civ. P. 65(d). Although the Court finds that a preliminary injunction is warranted in this case, the Court

also finds that such an order should be more narrowly tailored and specific than the proposed order submitted by Plaintiff.

Therefore, the Court ORDERS as follows:

During the pendency of this action, defendant Elite Fundraising LLC and its officers, agents, affiliates, and representatives (collectively "Elite") are restrained and enjoined from:

    (A)    Making any statement that is calculated to or is likely to cause a third party to believe that he or she had previously done business with Elite for a fundraising product on behalf of a school or organization, when in fact Elite has not previously done such business with the third party on behalf of that particular school or organization.

    (B)    Failing to identify themselves as representatives of Elite when soliciting merchants for participation in fundraising card programs.

To provide Elite with time to distribute and explain the terms of this injunction to its employees, this Order shall become effective at 12:01 a.m. PDT on Monday, September 19, 2005.

Fed. R. Civ P. 65(c) provides that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Here, the Court finds that no security from Varsity Gold should be required, given the limited terms of this injunction. As one commentator has noted, "it has been held that the court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant." 11A Chas. A. Wright et al., Federal Practice & Procedure § 2954, at 292-93 (2d ed. 1995). It does not appear that the restraints included in the injunction create a risk of monetary loss to Elite. Indeed, solicitation scripts produced by Elite indicate that Elite representatives are already supposed to identify themselves as Elite representatives when they call merchants. (Dkt. 23, Ex. 1-A). In addition, Elite has offered no evidence or argument regarding an

ORDER - 15

1 appropriate security amount, despite Varsity Gold's request in its moving papers to dispense with
2 security.
3     The clerk is directed to provide copies of this order to all counsel of record.
4     Dated: September 15, 2005

6                                          s/Marsha J. Pechman
                                           Marsha J. Pechman
7                                          United States District Judge

ORDER - 16